## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| | : | |
| BONNIE GRANT, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 09-1222 |
| | : | |
| THE PHILADELPHIA EAGLES LLC, | : | |
| | : | |
| Defendant. | : | |

_____ :

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                    **JUNE      , 2009**

Presently before the Court is a Motion to Dismiss Compelling Arbitration filed by

Defendant, the Philadelphia Eagles LLC ("the Eagles"), against Plaintiff, Bonnie Grant

("Grant"). For the reasons set forth below, the Motion will be granted.

## I.      BACKGROUND

Grant brought this action against the Eagles alleging claims arising from her former

employment with the Eagles as its Director of Communications.[1]  Grant claims that the Eagles

discriminated against her on the basis of sex and disability,[2] and retaliated against her. She also

---

[1]Grant brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §
2000(e), et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a), the American
with Disabilities Act, 42 U.S.C. § 12101, et seq., and the Pennsylvania Human Relations Act, 43
P.S. § 951 et seq.

[2]During her employment with the Eagles, Grant was being treated for cancer, and she was
active through her public work in raising awareness about cancer issues.  Grant claims that after
raising concerns about her cancer, the Eagles began to "issue petty and unsupported discipline."
Grant complained to the Eagles that similarly situated males were not being disciplined the same
way.  Grant further asserts that when the Eagles directed her not to discuss her cancer history, she
complained that she was being discriminated against based on her disability, and that rather than
investigating these complaints, the Eagles terminated her employment without warning.  (Compl.

asserts tort claims for unauthorized use of name or likeness and invasion of privacy by misappropriation of identity, and a claim for breach of contract.

Grant began working for the Eagles on October 3, 2005.  Prior to this job, she held a prominent public relations position with the City of Philadelphia representing the City and the Mayor at public events, and also sat on the boards of several civic institutions.  In August 2005, she was interviewed by Eric Newman, the Eagles' Director of Human Resources, and discussed the job, its requirements, the Eagles' business, salary proposal, and benefits.  Grant states that at no time did Newman mention and/or discuss arbitration of disputes, or any other forms of dispute resolution.  Grant later met with Eagles executives Mark Donovan, Joe Banner, and Jeffrey Lurie, and asserts that she discussed the position with all of them; however, none mentioned the issue of arbitration.  (Grant Decl. ¶ 10.)

After some negotiation regarding salary, Grant was offered the position of Director of Communications with the Eagles, which she verbally accepted.  On September 16, 2005, the Eagles sent Grant a letter setting forth the terms and conditions of her employment, including salary, benefits, and a severance agreement.  Grant asserts that nothing in this letter addresses and/or mentions the issue of arbitration of any disputes, and that the contract of employment was complete after the Eagles memorialized the parties' agreement.  Grant further states that on her first day of work, October 3, 2005, she was given several routine forms to complete including life insurance beneficiary information, a W- 4 tax form, and a document titled "Agreement" ("Agreement") which speaks about the issue of arbitration.  (Grant Decl. ¶ 16.)  Grant claims that, at no time, did the Eagles explain the Agreement or otherwise discuss the implications of its

¶ 18-25.)

requirements that she surrender her legal rights, and, at no time, was she provided a copy of the

National Football League's ("NFL") procedural guidelines concerning arbitration.  (Id. ¶ 17-19.)

The Agreement states as follows:

> In consideration of my employment by The Philadelphia Eagles
> LLC, I hereby agree to comply at all times with and be legally
> bound by the Constitution and Bylaws of the National Football
> League ("NFL"), in their present form and as amended from time
> to time hereafter; and by the decisions of the NFL Commissioner,
> I agree that all matters in dispute between myself and The
> Philadelphia Eagles LLC, shall be referred to the Commissioner for
> binding arbitration, and his decision shall be accepted as final,
> conclusive and unappealable by me and The Philadelphia Eagles
> LLC.
>
> I further agree to release and discharge the Commissioner, the NFL
> and any league in which The Philadelphia Eagles LLC may
> hereafter become a member, each of its subsidiaries, affiliates and
> member clubs, and each of their respective owners directors,
> stockholders, partners, officers, employees, agents and holders of
> an interest therein, and all of them, in their individual and
> representative capacities, from any and all claims, demands, suits,
> losses, damages, liabilities, actions and/or causes of action arising
> out of, relating to or in any way connected with any decision of the
> Commissioner (whether in connection with a dispute involving me
> and the Philadelphia Eagles or otherwise) that involves or in any
> way affects me, except to the extent of awards made to me by the
> Commissioner.

(Def.'s Mot. Dismiss, Ex. C.)

Grant argues that she is not bound by this Agreement since neither party intended it to be

part of her employment contract as evidenced by the fact that the terms were never part of the

discussion of her employment with the Eagles.  Grant asserts that the Agreement was not

presented to her as part of her job application, offer, or contract with the Eagles, and that even

after she raised issues of discrimination while at work and after her employment was terminated,

the Eagles did not suggest that she was required to arbitrate her claims.  (Grant Decl. ¶ 22, 24.)

## II.    STANDARD OF REVIEW

Motions to compel arbitration are evaluated under the well-settled summary judgment standard set forth in Federal Rules Civil Procedure 56(c).  Bullick v. Sterling Inc., No. 03-6395, 2004 WL 2381544, at *2 (E.D. Pa. Oct. 21, 2004); Choice v. Option One Mortgage Corp., No. 02-6626, 2003 WL 22097455, at *3 (E.D. Pa. May 13, 2003); Berkery v. Cross Country Bank, 256 F. Supp. 2d 359, 364 n.3 (E.D. Pa. 2003).  Thus, "movants must prove through 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . that there is no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(c)).   "The court must consider all of the non-moving party's evidence and construe all reasonable inferences in the light most favorable to the non-moving party."  Id.

## III.    DISCUSSION

### A.  The Federal Arbitration Act

Originally passed in 1925, the Federal Arbitration Act, 9 U.S.C. § 1, et seq. (the "FAA") was enacted to "revers[e] centuries of judicial hostility to arbitration agreements" by "plac[ing] arbitration agreements upon the same footing as other contracts."  Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1113 (3d Cir. 1993).  The FAA makes agreements to arbitrate enforceable to the same extent as other contracts.  Seus v. Nuveen & Co., 146 F.3d 175, 178 (3d Cir. 1998).  Thus, federal law presumptively favors the enforcement of arbitration agreements.  In re Prudential Ins. Co. of Am. Sales Practice Litig., 133 F.3d 225, 231 (3d Cir. 1998).  The FAA mandates that "any doubts concerning the scope of arbitrable issues should be

4

resolved in favor of arbitration." <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983); <u>see also</u> <u>Battaglia v. McKendry</u>, 233 F.3d 720, 727 (3d Cir. 2000).  Further, the FAA "directs courts towards vigorous enforcement of arbitration, requiring that an arbitration agreement 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"[3] <u>Id.</u>

## B.  Pennsylvania Contract Law

The federal policy encouraging recourse to arbitration requires federal courts to look first to the relevant state law of contracts, in this case, Pennsylvania, in deciding whether an arbitration agreement is valid under the FAA.  <u>First Options of Chi., Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995); <u>Spinetti</u>, 324 F.3d at 213-14.

Under Pennsylvania law, a court looks to three criteria to determine whether a valid contract has been formed: "(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." <u>ATACS Corp. v. Trans World Commc'ns, Inc.</u>, 155 F.3d 659, 666 (3d Cir. 1998).  In other words, if the terms are indefinite, there is no assent, and consequently, no agreement.  The "test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently

_____

[3]In <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105 (2001), the U.S. Supreme Court resolved any lingering question concerning the FAA's applicability to arbitration agreements in the employment context.  It held that with a limited exception (not applicable here), arbitration agreements covering employment-related claims fall within the FAA's provisions.  <u>Id.</u> at 119, 121. (holding that in the employment context "only contracts of employment of transportation workers" are exempted from the FAA's coverage); <u>see also</u> <u>Spinetti v. Serv. Corp. Int'l.</u>, 324 F.3d 212, 218 (3d Cir. 2003).

definite to be specifically enforced." Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986).  Agreements to arbitrate in Pennsylvania are upheld only where it is clear that the parties have agreed to arbitrate their disputes- employment and otherwise- in a clear and unmistakable manner.  Quiles v. Fin. Exch. Co., 879 A.2d 281, 287 (Pa. Super. Ct. 2005).  Any waiver of an employee's statutory right to a judicial forum to assert employment claims must be clear and unmistakable.  Gen. Elec. Co. v. Deutz, 270 F.3d 144, 154 (3d Cir. 2001) (quoting First Options of Chi., 514 U.S. at 944).  Without knowing the terms of the contract, one cannot accept them.  Quiles, 879 A.2d at 288.  As discussed below, we find that the Agreement at issue here constitutes a valid contract between the parties, and will be enforced.

## C.  The Validity of the Agreement

### 1.  Intent to be Bound by the Agreement

Grant first asserts that neither party intended for the Agreement to be part of her employment contract.  She argues that the terms were never part of the discussion of her employment with the Eagles, and it was never presented to her in conjunction with her job application, offer of employment, or employment contract.  In support of her position, Grant cites Quiles v. Fin. Exch. Co., supra, which held that no valid agreement to arbitrate may exist "if the terms of the [arbitration] process were never fully communicated to [plaintiff]," and that "without being given information explaining the company's policy to exclusively arbitrate any workplace disputes, [an employee] could not accept the terms of the agreement to arbitrate."  879 A.2d at 288.

Quiles, however, fails to support Grant's position, as its facts significantly differ from

6

those of the instant action.  In <u>Quiles</u>, the court determined that since the employee/plaintiff was never given copy of an employee handbook that included the information explaining the defendant's policy to exclusively arbitrate any workplace disputes, the employee was unable to accept terms of the agreement to arbitrate, and without employee's acceptance, there was no agreement formed between the parties.  <u>Id.</u> at 285.  The court, thus, concluded that there were no grounds to compel arbitration of employee's defamation claim against the employer.  <u>Id.</u>  Here, there is no question that Grant received the Agreement, read it, understood it, and signed it.

Grant argues that she did not believe that the Agreement applied to her, but instead believed that it had been mistakenly given to her.  She states that she believed that the Agreement applied only to football players who were represented by the NFL's players' union.  (Grant Decl. ¶¶ 15, 18.)  "Parties cannot be permitted to repudiate their written contracts merely by asserting that they neglected to read them, or did not really mean them."  <u>Bullick</u>, 2004 WL 2381544, at *5; <u>see also</u> <u>Green v. Shearson Lehman/Am. Express Inc.</u>, No 85-1368, 1985 WL 2640, at *1 (E.D. Pa. Sept. 10, 1985) (citing <u>Standard Venetian Blind Co. v. Am. Empire Ins. Co.</u>, 469 A.2d 563 (Pa. 1983)).  In addition, ignorance of the contents of a document before signing is no defense to a contractual obligation under Pennsylvania law.  <u>Tose v. First Pa. Bank, N.A.</u>, 648 F.2d 879, 900 (3d Cir. 1981); <u>Estate of Brant</u>, 463 Pa. 230, 235-36 (Pa. 1975).  Here, there is no basis for Grant's belief that the agreement did not pertain to her simply because she was not a player and was not represented by the players' union.  It is obvious that a professional football organization, such as the Eagles, consists of many more employees than just players, evidenced by the fact that Grant herself was hired in the public relations department of the organization. The Eagles also had no obligation to ensure that Grant digested the contract terms, consulted

with counsel, or had time to deliberate or negotiate.  See Seus, 146 F.3d at 183; Smith v. Creative Res., Inc., No. 97-6749, 1998 WL 808605, at *2 (E.D. Pa. Nov. 23, 1998).  Accordingly, this argument is without merit.

Moreover, Grant has not cited any case, nor have we found any case in support of her argument that an arbitration agreement is valid only if executed prior to the beginning of employment.  Rather, this Court has not hesitated to find an enforceable agreement to arbitrate, where, as here, an arbitration policy is instituted during an employee's employment and the employee continues to work for the employer thereafter.  Grant was given the arbitration agreement at the commencement of her employment along with several other papers concerning her employment.  She signed the Agreement and continued to work for the Eagles.  In Wetzel v. Baldwin Hardware Corp., No. 98-3257, 1999 WL 54563, at *2 (E.D. Pa. Jan. 29, 1999), the plaintiff continued working for his employer despite the fact that he had received a copy of the arbitration policy and accompanying explanatory memorandum.  Id.  However, nearly a year after he received a copy of the arbitration policy, and without following any of the procedures set forth in the arbitration agreement, the plaintiff attempted to bring a claim in federal court against his employer under the Age Discrimination in Employment Act.  The court held that the plaintiff's continued employment indicated his acceptance of the arbitration agreement.  Id. at *4.

Similarly, in Lepera v. ITT Corp., No. 97-1461, 1997 WL 535165, at *4 (E.D. Pa. Aug. 11, 1997), the plaintiff-employee continued to work after receipt of a unilaterally imposed, mandatory arbitration policy which specifically stated that the policy prevented employees from access to a judicial forum in employment disputes.  Id.  When the plaintiff failed to comply with the policy by bringing tort claims against his employer in federal court, the court granted the

8

defendant's motion to compel arbitration.  Id.  The court observed that the plaintiff "clearly and unequivocally worked after receipt of the Policy."  Id.  Accordingly, the court held that the plaintiff had "accepted [his employer's] offer of continued employment with a [sic] arbitration provision in his contract when he continued working after he received the Policy," and, therefore, must arbitrate his claims.  Id. at *5; see also Wilson v. Darden Rests., Inc., No. 99-5020, 2000 WL 150872, at *3 (E.D. Pa. Feb. 11, 2000); Venuto v. Insur. Co. of N. Am., No. 98-96, 1998 WL 414723, at *5 (E.D. Pa. July 22, 1998) ("[A]n employee's decision to continue working with an employer for a substantial period of time after the imposition of a new policy demonstrates acceptance of its terms.").

### 2. Terms of the Contract

Grant next argues that the terms of the Agreement are not sufficiently definite to be enforced.  Grant asserts that under Pennsylvania law, an agreement cannot be definite, and therefore no contract exists unless there is a meeting of the minds on the essential terms of the contract.  Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd., 426 A.2d 1152, 1154 (Pa. Super. Ct. 1981).  We first note that the "presumption [in favor of arbitrability] is particularly applicable where the [arbitration] clause is . . . broad."  AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 650 (1986); Brayman Const. Corp. v. Home Ins. Co., 319 F.3d 622, 625 (3d Cir. 2003).

Here, the terms contained in the Agreement are not only broad, but clear and unambiguous.  As noted, the Agreement simply provides that the parties agreed that "all matters in dispute between [Grant] and The Philadelphia Eagles LLC, shall be referred to the Commissioner for binding arbitration . . . ."  (Def.'s Mot. Dismiss, Ex. C.)  By signing the Agreement, Grant acknowledged that she necessarily accepted its terms and conditions therein.

Since there is no ambiguity in the Agreement pertaining to the instances in which submission of

claims to arbitration is required, and because Grant knew that her signature on the Agreement

constituted an acceptance of its terms, there was no lack of a meeting of the minds to justify

invalidation of the Agreement.  Bullick, 2004 WL 2381544, at *6.

### 3.  The Agreement is Supported by Consideration

Grant further contends that the Agreement is not a valid contract because there was no

consideration to support it, as she had already been offered and had accepted an employment

contract in the form of the September 16, 2004 letter.  This claim, however, has no merit.  This

court has repeatedly held that continued employment fulfills the consideration requirement under

Pennsylvania law.  See Hamilton v. Travelers Prop. & Cas. Corp., No. 01-11, 2001 WL 503387,

at *2 (E.D. Pa. May 11, 2001) (finding continued employment of two years following receipt of

the employee handbook which included an arbitration agreement sufficient to constitute

acceptance and consideration); see also Gutman v. Baldwin Corp., No. 02-7971, 2002 WL

32107938, at *4 (E.D. Pa. Nov. 22, 2002); Wilson, 2000 WL 150872, at *3-4; Wetzel, 1999 WL

54563, at *3.  In addition, when both parties have agreed to be bound by arbitration, adequate

consideration exists, and the arbitration agreement should be enforced.  Blair v. Scott Specialty

Gases, 283 F.3d 595, 603-04 (3d Cir. 2002).

### 4.  The Eagles' Failure to Execute the Contract

Grant also asserts that the Eagles' failure to execute the Agreement demonstrates that the

Eagles never intended for the Agreement to apply to her employment.[4]  Grant argues that when

---

[4]The Agreement was signed by Grant, but was not signed by the Eagles.  (See Def.'s Mot. Dismiss, Ex. C.)

an agreement requires an executed writing, no agreement exists until it is executed.  She claims

that the Eagles' failure to execute evidences their lack of intention to include the arbitration

clause in the employment agreement.  In support of her position, Grant cites Shovel Transfer &

Storage, Inc. v. Pa. Liquor Control Bd., which held that "where . . . the parties contemplate that

their agreement cannot be considered complete before it is reduced to writing, no contract exists

until the execution of the writing."  699 A.2d 1324, 1329 (Pa. Commw. Ct. 1997).

     Grant's argument, however, is flawed for two reasons.  First, she has produced no

evidence that the parties only considered the terms of her employment to be complete when

reduced to writing.  Second, Grant is mistaken that the Eagles' failure to execute the Agreement

shows their intention not to include the arbitration provision in her employment contract.  The

FAA requires an agreement to be in writing, however; "it does not require that the writing be

signed by the parties."  Venuto, 1998 WL 414723, at *4; see also Nghiem v. NEC Elec., Inc., 25

F.3d 1437, 1439 (9th Cir. 1994) (citing Genesco, Inc. v. T. KaKiuchi & Co., 815 F.2d 840, 846

(2d Cir. 1987)); 9 U.S.C. § 2.

**D.  Unconscionability**

     Grant next argues that the Agreement cannot be enforced because it is unconscionable.

"Unconscionability is a defensive contractual remedy which serves to relieve a party from an

unfair contract or from an unfair portion of a contract."  Harris v. Green Tree Fin. Corp., 183

F.3d 173, 181 (3d Cir. 1999).  "Under Pennsylvania law, the test for unconscionability is whether

one of the parties lacked a meaningful choice about whether to accept the provision [or contract]

in question and the challenged provision or contract unreasonably favor[s] the other party to the

contract."  Zumpano v. Omnipoint Commc'ns, Inc., No. 00-595, 2001 WL 43781, at *5 (E.D. Pa.

11

Jan. 18, 2001). "In evaluating claims of unconscionability, courts generally recognize two categories, procedural, or 'unfair surprise' unconscionability, and substantive unconscionability." <u>Harris</u>, 183 F.3d at 181. It is the plaintiff's burden of proof to show unconscionability. <u>Williams v. Borough of W. Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989). Under Pennsylvania law, there must be both procedural and substantive unconscionability in order to void an arbitration provision or a contract in general. <u>Harris</u>, 183 F.3d at 181; <u>Bellevue Drug Co. v. Advance PCS</u>, 333 F. Supp. 2d 318, 332 (E.D. Pa. 2004).

**1. Procedural Unconscionability**

Procedural unconscionability describes the process by which the parties entered into the contract. It has been defined by the Pennsylvania Supreme Court as the "absence of meaningful choice on the part of one of the parties." <u>Witmer v. Exxon Corp.</u>, 434 A.2d 1222, 1228 (Pa. 1981). Procedural unconscionability is generally found where the agreement is a contract of adhesion. <u>Alexander v. Anthony Int'l., L.P.</u>, 341 F.3d 256, 265 (3d Cir. 2003). A contract of adhesion is one prepared by a party with excessive bargaining power and presented to the other party on a "take it or leave it" basis. <u>Parilla v. IAP Worldwide Servs., VI, Inc.</u>, 368 F.3d 269, 276 (3d Cir. 2004). Often, the other party to the contract is told that the terms of the contract are non-negotiable. <u>Denlinger, Inc. v. Dendler</u>, 608 A.2d 1061, 1068 (Pa. Super. Ct. 1992). The touchstone is whether the party challenging the agreement had any meaningful choice regarding acceptance of its provisions. <u>Thibodeau v. Comcast Corp.</u>, 912 A.2d 874, 886 (Pa. Super. Ct. 2006); <u>see also</u> <u>Hopkins v. NewDay Fin., LLC</u>, No. 07-3679, 2008 WL 2654635, at *2 (E.D. Pa. June 30, 2008).

Grant argues that the Agreement is a contract of adhesion. She contends that the

Agreement is procedurally unconscionable for the same reasons that it is not a valid contract that it was never presented to her as part of her employment contract, and she "never had the opportunity to discuss, much less negotiate, its terms."  (Pl.'s Resp. Mot. Dismiss at 10.)  It is her assertion that weeks after she had accepted the employment contract with the Eagles (referring to the September 16, 2005 letter), the Agreement was unilaterally presented to her mixed with benefit and tax paperwork.

Inequality of bargaining power does not render a contract or contract term unenforceable. See Great W. Mortg. Corp. v. Peacock, 110 F.3d 222, 229 (3d Cir. 1997); Witmer v. Exxon Corp., 495 Pa. 540 (Pa. 1981).  Even an adhesionary contract term is enforceable unless it is "so one-sided as to be oppressive."  Seus, 146 F.3d at 184; see also Koval v. Liberty Mut. Ins. Co., 531 A.2d 487, 491 (Pa. Super. Ct. 1987) (term enforceable unless it "unreasonably favors the other party to the contract").  Moreover, an arbitration term does not favor one party over the other since it does not prevent either party from enforcing a substantive right in a neutral forum. Smith, 1998 WL 808605, at *1.

In this matter, there is no evidence that there was an inequity of bargaining power between the Eagles and Grant, nor can the Agreement be deemed to be adhesionary.  As discussed above, Grant was presented with the Agreement at the time she started her employment with the Eagles.  She read the Agreement, and makes no argument that she did not understand its simple terms that applied equally to both parties.  In fact, Grant does not even suggest that she cannot receive a fair adjudication in arbitration.  Viewing the evidence in the light most favorable to Grant, and with all reasonable inferences drawn in her favor, the Agreement is not procedurally unconscionable.

13

### 2. Substantive Unconscionability

"Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." Harris, 183 F.3d at 181; Jones, 749 F. Supp. at 838. "To establish substantive unconscionability, the plaintiff must show that the contractual terms are unreasonably favorable to the drafter, and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions." Bullick, 2004 WL 2381544, at *10; Dabney, 2001 WL 410543, at *5.

Grant states that the Agreement is substantively unconscionable because it requires her to pay arbitration fees to initiate claims, and that the Agreement also imposes a forum selection of New York which could be a serious cost burden to her. (Grant Decl. ¶¶ 26-27.) "An arbitration provision that makes the arbitral forum prohibitively expensive for a weaker party is unconscionable." Parilla, 368 F.3d at 284. The Supreme Court has held that a party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of showing the likelihood of incurring such costs. Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 92 (2000). Here, Grant has not met that burden. She has offered no evidence that she would be financially burdened by the cost,[5] or that she would be burdened if the arbitration was conducted in New York City.

In addition, the guidelines governing arbitration in this matter ("Guidelines") do not provide that the party bringing the action would be assessed the costs of the arbitration, but rather provide, that each party would bear its own costs "absent special circumstances." In addition,

―――――――――――――――――

[5]This argument is also moot at this point since the Eagles have agreed to pay the cost of arbitration.

14

they state that the Commissioner <u>may</u> apportion the costs "as he deems reasonable."  (<u>See</u> Def.'s Reply Br., Ex. C, at ¶ 13.3.)  Moreover, the Guidelines do not mandate that the arbitration be conducted in New York City.  The Guidelines state that the "Commissioner <u>may</u> conduct hearings at the NFL office in New York <u>or any other location</u> he deems appropriate after consultation with the parties." (<u>Id.</u> ¶ 4 (emphasis added).)  Furthermore, "hearings may be conducted by telephone if the parties consent."  (<u>Id.</u>)

Grant also claims that the Agreement interferes with her ability to fully pursue her legal rights by restricting discovery, not applying the rules of evidence, and providing for the full scope of relief allowed by law.  However, the Guidelines indicate otherwise, and provide for full discovery and for all remedies for both parties at the discretion of the Commissioner.[6]   Thus, again viewing the evidence in the light most favorable to Grant, and with all reasonable inferences drawn in her favor, the Agreement is not substantively unconscionable.

Lastly, Grant asserts that even if we find that the Agreement is enforceable, we should not dismiss this action, but only stay it, pending the outcome of the arbitration.  Grant argues that "this is so because of the likely potential that the arbitrator will find that certain claims are not within the scope of the arbitration agreement and that those claims should instead proceed in court."  (Pl.'s Resp. Mot. Dismiss at 12.)  This assertion, however, is speculative, and Grant fails to offer any indication of just what claims would not be found within the scope of the

---

[6]Section 6.1 of the Guidelines states that "the Commissioner may in his discretion or at the request of a party, permit, limit or disallow discovery, or compel a party to provide such discovery as he considers necessary to an appropriate exploration of the issues in dispute." (Def.'s Reply Br., Ex. C.)  In addition, Section 13.1 provides that "the Commissioner may grant final, interim, interlocutory and partial relief, and may grant any remedy or relief that he deems just and equitable, including injunctive and equitable relief." ( <u>Id.</u>)

Agreement.  When all of a party's claims are within the scope of the arbitration provision, an order of dismissal is appropriate.  <u>Seus</u>, 146 F.3d at 179; <u>Smith</u>, 1998 WL 808605, at *3. Accordingly, we decline to stay this action, and grant the Motion to Dismiss Compelling Arbitration.

      An appropriate Order follows.